## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BENJI DON PARSONS,

       Plaintiff,

v.

EXPERIAN INFORMATION
SOLUTIONS, INC.,

       Defendant.

**Case No.:** 2:26-cv-00159

**JURY TRIAL DEMANDED**

## COMPLAINT

Benji Don Parsons ("Plaintiff" or "Mr. Parsons") a living, breathing 50-year-old consumer, brings this action on an individual basis, against Experian Information Solutions, Inc. ("Experian") and states as follows:

## INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is

disseminated and/or obtained about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

[W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10. The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11. Plaintiff's claims arise out of Defendant's blatantly inaccurate credit reporting, wherein Defendant Experian reported to Plaintiff's potential creditors that he is "deceased" and does not have a credit score.

12. Defendant communicated to one or more third parties that Plaintiff's name, date of birth, address and social security number were associated with that of a deceased person which was intended to communicate a high risk of fraud.

13. Accordingly, Plaintiff brings claims against Defendant Experian for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

14. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

15.    Benji Don Parsons ("Plaintiff" or "Mr. Parsons") is a natural person residing in Ravenswood, West Virginia, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16.    Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626, and is authorized to do business in the State of West Virginia, including within this District.

17.    Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

20.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

21.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

22.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

23.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

24.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

### Defendant's Practices Concerning the Sale of Reports on the "Deceased"

25.     Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

26.    Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27.    Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendant, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate 'permissible purposes."

28.    Defendant routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

29.    Defendant's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U/UNDESIGNATED" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

30.    Defendant does not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

31.    Defendant does not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

32.    Defendant does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

33.    In some cases, in order to assure accuracy, Defendant may send letters and/or other communications to consumers when certain information that may be considered suspicious or

unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendant does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to them to be placed in said consumer's credit file or report.

34.    The Social Security Administration (SSA) maintains the **Death Master File ("DMF")**. The DMF is also known commercially as the Social Security Death Index (SSDI). The SSA's DMF as of 2018 contained information on 111 million deaths that have been reported to the SSA. The DMF is created from internal SSA records of deceased persons possessing social security numbers and whose deaths were reported to the SSA. The DMF includes the following information on each decedent, if the data are available to the SSA: social security number, name, date of birth, and date of death.

35.    Legislation (i.e., the Social Security Act) precludes the sharing of the full DMF with non-benefits paying agencies.

36.    Because of the wide use and demand for death records for a variety of industries, SSA has partnered with the U.S. Department of Commerce's National Technical Information Service (NTIS) to release the **Limited Access Death Master File (LADMF)** electronically on a weekly and monthly basis.

37.    The SSA receives death reports from many sources, including family members, funeral homes, financial institutions, postal authorities, state information, and other federal agencies. The SSA does not have a death record for all persons; therefore, the SSA does not guarantee the veracity of the DMF. The SSA does not guarantee 100% of the data.

38.     The SSA estimates that roughly 12,000 living people are added to the DMF annually, potentially due to clerical error. An erroneous listing can lead to not only a cessation of government benefits, but also the freezing of bank accounts, the inability to buy or rent property, and mistaken accusations of identity theft.[1][2]

39.     The Office of the Inspector General called the error rate "very low," but noted that "SSA's erroneous death entries can lead to mistaken benefit terminations and cause severe financial hardship and distress to affected people…when errors like this occur, it can be a long and difficult process to resurrect your financial health.[3]

40.     Defendant does not have access to the full DMF from the SSA, but rather are subscribers to the NTIS LADMF.

41.     Despite being subscribers of the NTIS LADMF, Defendant does not cross-reference the "X", or "U/UNDESIGNATED" code received from data furnishers with the LADMF in order to determine whether any given consumer reported as deceased via a furnishing source is also on the LADMF *before* selling a credit report about said consumer, or at any time.

42.     Defendant will only cross-reference the NTIS LADMF to sell additional products for an additional fee to their subscribers regarding information contained within the LADMF.

43.     Defendant fails to employ reasonable procedures that assure that a consumer is actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

---

[1] *Aviva Dekornfeld (2018-06-20). "The Plight of the Living Dead". The Indicator from Planet Money (Podcast).*

[2] Bichell, Rae Ellen (2016-08-10). "Social Security Data Errors Can Turn People into the Living Dead". *National Public Radio*.

[3] "Cases of Mistaken Death Reports Low but Costly | Office of the Inspector General, SSA". *oig.ssa.gov*. 2016-03-24. Archived from the original on 2020-07-16.

44.    Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark in that consumer's file.

45.    Even in instances where the purportedly deceased consumer communicates directly with Defendant, Defendant does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark on that consumer's report.

46.    Once a "deceased" mark is placed upon a consumer's report, Defendant will not calculate and will not provide a credit score for that consumer.

47.    Upon Defendant's reports with a "deceased" mark sold to third parties, Defendant never calculates or provides a credit score for that consumer and instead reports that consumer's credit score as "N/A."

48.    Defendant knows that third party credit issuers require a credit score in order to process a given credit application.

49.    Defendant knows that consumers without credit scores are unable to secure any credit from most credit issuers.

50.    Defendant knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

51.    Defendant has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendant is inaccurately reporting them as "deceased" and without a credit score.

52.    Defendant has received and documented many disputes from consumers complaining that Defendant had erroneously marked them as "deceased" on their credit reports.

53. Defendant knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" or "U/UNDESIGNATED" code.

54. Nevertheless, Defendant does not employ any procedures to assure that a consumer is actually deceased before adding a "deceased" notation to that consumer's credit file and credit reports.

55. Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance modifies its reporting first.

56. Defendant does not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

57. Nor does Defendant employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

58. For years after a consumer's actual death, Defendant will continue to sell credit reports about that consumer.

59. Defendant will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

60. Defendant charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

61. Defendant profits from the sale of reports on deceased consumers.

62.     Defendant has in their respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

63.     Defendant knows that truly deceased consumers do not apply for credit.

64.     Defendant knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendant to be a common and major source of identity theft.

65.     Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

66.     Defendant warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

67.     Defendant has no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

68.     Defendant sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

69.     For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendant to sell their credit reports, absent a court order.

70.    Defendant knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Plaintiff Applies for a Loan with H&R Block**

71.    In or about November 2025, Plaintiff planned to apply for a tax advance loan with H&R Block.  This loan serves as a tax-season advance, wherein Plaintiff provides pay stubs as evidence of income and tax liability to secure the funds.

72.     Plaintiff has  a long-standing history of applying and receiving this specific loan annually without issue, utilizing the proceeds to manage essential household expenses and holiday related costs for his three children, ages, 16, 13, and 3 years-old.

73.    Plaintiff relied on these funds for end-of-year financial obligations, the availability of this loan is crucial to the Plaintiff's ability to provide for his family's immediate needs during the holiday season.

74.    On November 4, 2025, Plaintiff completed and submitted a loan application with H&R Block.   The application for the H&R Block loan collected all of Plaintiff's personal identification information, including his social security number, and ordered his credit reports and/or credit scores in order to determine Plaintiff's credit eligibility for financing purposes.

**H&R Block Denies Plaintiff's Loan Application November 2025**

75.    Shortly after submitting his loan application, Plaintiff received a letter stating that H&R Block was unable to approve Plaintiff for a loan because Defendant reporting him as deceased on his credit report, and consequently, Defendant was not reporting a credit score for Plaintiff.

76. On or about November 4, 2025, H&R Block denied Plaintiff's loan application based upon the contents of Defendant's credit reports sold about Plaintiff.

77. Due to Defendant's inaccurate reporting, Plaintiff was not offered the loan that he needed.

78. Ultimately, and much to Plaintiff's embarrassment and humiliation that he could not provide for his family and secure the much-needed loan to accommodate their three children.

**Plaintiff Obtains His Credit Reports and Confirms the Deceased Notation on his Credit File**

79. Plaintiff checked his Experian credit report online and noticed that he had no credit score with them. Plaintiff did not see the same issue with non-parties Equifax or Trans Union.

80. Accordingly, on or around November 4, 2025, Plaintiff also called Social Security Administration and confirmed that he was not reported as deceased in their system.

81. On or about November 7, 2025, after receiving the H&R Block denial, Plaintiff viewed a copy of his Experian credit file.

82. Upon review, Plaintiff saw that there was no credit score and/or a deceased notation on his Experian credit file.

83. In addition, Plaintiff saw that Defendant Experian was reporting a single account, Consumer Portfolio SVC beginning with 4002 with a deceased notation.

84. Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

85. As a result of the "deceased" notation, the Defendant made it essentially impossible for Plaintiff to continue to obtain a much needed loan.

86.    On or about November 18, 2025, Plaintiff mailed a dispute letter to Defendant. Upon information and belief, Defendant received this dispute letter. However, Plaintiff never received a dispute response from Defendant.

87.    On January 12, 2026, Plaintiff obtained an updated copy of his Experian credit report and Experian had corrected the report, removing any indication that Plaintiff was deceased.

88.    At all times pertinent hereto, Defendant was acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

89.    At all times pertinent hereto, the conduct of Defendant, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

90.    Defendant is aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs.  Accordingly, Defendant's violations of the FCRA are willful.

91.    As a direct and proximate result of the loan denial, Plaintiff suffered significant financial hardship and emotional distress. At the time of the denial, Plaintiff was the sole provider for his household, and the loss of the anticipated funds, which he relied upon to manage essential bills and provide for his three children during the holidays, caused him to fall behind on critical expenses and placed his family under extreme financial strain and instability. Beyond the economic impact, Plaintiff suffered substantial emotional anguish from being falsely reported as deceased, an experience that caused immediate shock, confusion, and fear. The indignity of having his financial identity compromised, coupled with the anxiety of being unable to support his family, resulted in ongoing emotional turmoil. This distress was further exacerbated by Defendant's failure

to respond to his dispute, leaving Plaintiff in a state of uncertainty and fear regarding his financial security until the dispute process eventually concluded.

92.     As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to loan and benefit from his good credit rating; detriment to his credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I

### 15 U.S.C. § 1681e(b)

### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

### (First Claim for Relief Against Defendant Experian)

93.     Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

94.     The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

95.     Defendant Experian prepared patently false consumer reports concerning Plaintiff.

96.     Despite actual and implied knowledge that Plaintiff is not dead, Defendant Experian readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

97.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

98.    As a result of Defendant Experian's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

99.    Defendant Experian's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

100.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendant negligently and/or willfully violated the FCRA;

ii.    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

### DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED on this 26th day of February, 2026.

/s/ Matthew P. Crimmel
Matthew P. Crimmel, Esq.
*Attorneys for Plaintiff Benji Don Parsons*
MATTHEW P. CRIMMEL, ESQ.,
ATTORNEY AT LAW PLLC
1042 Greystone Circle
Morgantown, WV 26508
T: (800) 982-8660
E: matt@mpcrimmellaw.com